**In the United States District Court
for the District of Kansas**

————————

Case No. 25-cr-40047-TC-1

————————

United States of America,

*Plaintiff*

v.

Yonas Tsegay,

*Defendant*

————————

**MEMORANDUM AND ORDER**

The Government filed an Indictment charging Yonas Tsegay with conspiracy to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), and interstate travel and transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952(a)(3). Doc. 1. Tsegay moves to suppress the evidence uncovered during a traffic stop. Doc. 28. For the following reasons, that motion is denied.

**I**

**A**

Tsegay alleges that the evidence was obtained in violation of his Fourth Amendment rights. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Absent a recognized exception, the Fourth Amendment prohibits suspicionless seizures or warrantless searches that violate a person's objectively reasonable expectation of privacy by invading a constitutionally protected space or

1

thing. *United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Traffic stops are seizures for Fourth Amendment purposes, *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), and in a traffic stop "a passenger is seized as well and so may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007).

A warrantless stop is valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). In particular, the officer must have "a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (quotation marks omitted). The stop also must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Morales*, 961 F.3d 1086, 1090–91 (10th Cir. 2020).

Ordinarily, the traffic stop is circumscribed by the traffic violation giving rise to the initial encounter. That means officers may conduct unrelated inquiries during a stop only if that conduct does not prolong the stop. *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). For example, it is accepted that officers may reasonably inquire as to the driver's license, automobile's registration and proof of insurance, identity of the individuals, and driver's travel plans. *United States v. Cates*, 73 F.4th 795, 806 (10th Cir. 2023) (citations omitted). But once the mission of the stop has concluded, the motorist is generally free to leave. *Morales*, 961 F.3d at 1091.

There are, of course, justifications for continued detention. For example, the driver may consent to further questioning. *United States v. Woody*, 45 F.4th 1166, 1173 (10th Cir. 2022). Or an officer may develop reasonable suspicion of other illegal activity distinct from the traffic violation. *See United States v. Munoz*, 162 F.4th 1210, 1219 (10th Cir. 2025). "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity." *Pettit*, 785 F.3d at 1379 (citations omitted). Instead, the officer needs only "a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Munoz*, 162 F.4th at 1219 (quotation marks omitted); *see id.* at 1222 (finding that police developed reasonable suspicion of criminal activity after initiating a traffic stop based on the

totality of the circumstances). A non-exhaustive list of factors that the Tenth Circuit has recognized as supporting reasonable suspicion include nervousness, unusual travel plans, criminal history, and travel route. *See id.* at 1220–22; *see also Pettit*, 785 F.3d at 1380–83 (holding that no one factor is determinative of reasonable suspicion of illegal activity). Accordingly, an officer who develops reasonable suspicion of illegal activity "may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Pettit*, 785 F.3d at 1379–80 (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)) (emphasis in original).

As a general matter, the authority to detain a motorist while investigating reasonable suspicion does not include the right to search the vehicle. Instead, a search of the vehicle must be justified by, for example, probable cause. *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023); *see also United States v. Pinder*, 121 F.4th 1367, 1371 (10th Cir. 2024) (allowing contemporaneous search incident to a lawful arrest). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Phillips*, 71 F.4th at 823 (quotation marks omitted). When an officer smells drugs, such as marijuana emanating from the vehicle, that observation is "entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause." *Id.* (quotation marks omitted). Additional observations—such as nervous behavior and vague travel plans—obviously strengthen the existence of probable cause. *See Munoz*, 162 F.4th at 1220–22.

**B**

In June 2025, Junction City police department K-9 officer, Nicholas Blake, told Undersheriff Justin Stopper of the Geary County Sheriff's Department that a white tractor-trailer would be driving through his area on Interstate 70 and that it "looked good."[1] Stopper testified that he took this tip to mean that the tractor-trailer fit certain (but unspecified) drug trafficking criteria that made it a candidate for an

---

[1] The following facts were found based on the witness's testimony and the evidence produced at the suppression hearing.

interdiction stop. Stopper therefore sought to find, stop, and inspect the vehicle.[2]

Stopper subsequently located the tractor-trailer traveling eastbound on Interstate 70 while he was also traveling eastbound in his department-issued unmarked silver pickup truck. Stopper passed the tractor-trailer and noticed that it had a California registration plate and that the letters "AZK" were displayed on the side of the truck. He testified that these markings triggered his interest because he did not recognize them as the markings of a reputable operator. He also testified that he was intrigued by the tractor-trailer's lights based on his understanding of the history of this particular type of light.

The tractor-trailer was traveling immediately behind Stopper and, in his opinion, closer to Stopper than Kansas law permitted. Stopper then noticed that a car passed the tractor-trailer on the left and then the tractor-trailer moved into the left lane behind it. Stopper observed that the tractor-trailer followed that car too closely, too, leaving less than one second behind it and the car in front of it. Finally, once the tractor-trailer passed Stopper's patrol vehicle, Stopper observed that it quickly merged in front of him, leaving less than two seconds between the vehicles.

Stopper initiated a traffic stop based on these observed actions. In particular, he witnessed that the tractor-trailer followed his patrol vehicle and another car too closely in violation of K.S.A. § 8-1523(a) and that it later committed an unsafe passing maneuver in front of him in violation of K.S.A. § 8-1516(a). Stopper testified that he ran the tractor-trailer's license plate through the automated license plate reader system shortly before activating his lights and learned that the tractor-trailer was traveling northbound on Interstate 15 coming out of Southern California the day before the stop.

---

[2] Stopper's testimony suggested that he subjectively and intentionally sought the vehicle for the purpose of identifying a colorable basis to stop it for a traffic infraction even though he only sought to undertake an investigation as to potential drug trafficking. Tsegay makes no argument that this pursuit of his vehicle was unlawful. Instead, he only asserts that the stop exceeded the permissible scope of the traffic violation giving rise to the encounter.

As the traffic stop unfolded, Stopper became suspicious that the tractor-trailer was engaged in criminal activity. The following highlights observations that he made that contributed to that suspicion.

As he approached the cab of the tractor-trailer, Stopper took note of the seal number on the back of the trailer so he could compare it to the bill of lading to confirm the numbers matched. Based on his training and experience, a seal number that failed to match the bill of lading meant that the load had been accessed and the cargo potentially adulterated. Once he arrived at the passenger side of the tractor-trailer, he made contact first with the driver, Tsegay, and eventually with the co-driver (and co-defendant), Samson Haliab, who was lying on the bunk in the sleeper berth.

Stopper asked Tsegay for his driver's license and inquired about his travel plans. He briefly looked at the bill of lading that was located on the front passenger seat, which he believed Tsegay encouraged him to review. Although the automated license plate reader data placed the tractor-trailer in Southern California, the bill of lading said the truck was coming from Sacramento. And upon inquiry, Tsegay told Stopper that he was traveling from Sacramento, which is in Northern California.

Stopper also noticed that Tsegay and Haliab were extremely nervous. He testified that Tsegay seemed stressed based on his wide-eyed appearance, rapid and deep breathing, and his heartbeat causing "his shirt to bounce off his stomach," and that Haliab seemed to be displaying similar signs of stress. Stopper testified that the occupants' nervousness was uncharacteristic for members of the commercial vehicle motoring public who, in Stopper's experience, are accustomed to being stopped for inspections.

Stopper asked Tsegay to join him in his patrol car. In doing so, he brought Tsegay and Haliab's driver's licenses, the registration, and the documents located on the front passenger seat, which included the bill of lading. As he walked back to the patrol vehicle, Stopper talked to his partner, Blake, who had arrived at the scene in the intervening time, about the discrepancies between the automated license plate reader data and Tsegay's purported travel plans. Blake asked Stopper if the travel plans Tsegay provided were reflected in the tractor-trailer's log book, and Stopper responded that he had not yet reviewed it.

Stopper's suspicion increased during the discussions he had with Tsegay in his patrol vehicle. The first thing that caught his attention was the inconsistent—if not contradictory—travel plans. Tsegay initially responded that he was coming from Sacramento. But then he changed his story, explaining that he originated in Oakland, went to Denver and then back to Sacramento, and was now going to Georgia. Stopper testified that Tsegay's answers conflicted not only with the automated license plate reader data he had prior to the stop, but also with Tsegay's prior statement that he was traveling from Sacramento to Georgia.

The next thing that Stopper found peculiar was Tsegay's comments concerning the contents of the trailer. Tsegay told Stopper that he did not know what he was hauling and that someone else loaded his trailer. This was unusual, according to Stopper, because based on his experience it would be highly unusual for someone in the commercial trucking industry to be unaware of what was loaded in his trailer.

Related to Tsegay's purported unawareness of the contents of his load was the discrepancy between the seal number on the truck and the bill of lading. In the patrol vehicle, Stopper noticed that the seal number on the trailer did not match the bill of lading. He then shared this discrepancy with Blake, who had been talking to Haliab. Blake noticed an additional discrepancy with the date listed on the bill of lading. Blake then left Stopper's patrol vehicle momentarily to ask Haliab for the correct bill of lading. But when Haliab gave Blake another bill of lading and the officers reviewed it, they noticed that it corresponded to the seal number on the trailer but that the bill of lading indicated that the trailer was destined for Aurora, Colorado (which was west of their eastbound tractor-trailer). Stopper testified that the seal should not have remained on the trailer if Tsegay had previously unloaded in Aurora.

Believing that criminal activity was afoot, Stopper asked Tsegay if he had anything illegal in the truck. Tsegay responded that he did not and told Stopper that he could check inside the vehicle. Tsegay later reconsidered after he told Stopper that the trailer contained a U-Haul and unknown items and Stopper responded that the officers would search the truck based on his prior consent, telling Stopper that he would need to ask Haliab if they could search the truck. To confirm his suspicion, Stopper then asked Blake to deploy his K-9—Chera—around the truck and trailer for an exterior sniff. Blake reported that Chera had indicated to the odor of drugs and Stopper told Tsegay that,

based on Chera's indication, the officers were going to search the truck.

In order to search the trailer, Blake retrieved bolt cutters from his patrol vehicle and used them to break the seal on the trailer doors. Upon opening the trailer door, the officers could smell raw marijuana coming from within. The officers observed several loose boxes and a large U-Haul container. Blake then entered the trailer, looked inside a few of the boxes, and located marijuana.

Based on this discovery, the officers took the tractor-trailer to the nearby Special Operations Warehouse. There, the truck and trailer were processed and the officers ultimately found 110 cardboard boxes with 1,487.8 kilograms of marijuana and marijuana products, and seven cardboard boxes containing 100 packages of cocaine with a gross weight of approximately 118 kilograms.

The United States indicted Tsegay and Haliab. Doc. 1. The Indictment contained four counts: conspiracy to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), and interstate travel and transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952(a)(3). Doc. 1; Doc. 44 (memorializing Haliab's guilty plea).

Tsegay now moves to suppress. The only argument he made in his motion to suppress was that Stopper unlawfully prolonged the traffic stop by diverting from the mission of the traffic stop and into general law enforcement activities. *See* Doc. 28 (asserting the stop violated *Rodriguez v. United States*, 575 U.S. 348 (2015)). The Government opposes that argument. Doc. 32. An evidentiary hearing was held on April 1, 2026, where Stopper testified.

## II

Although Stopper initiated a traffic stop based on violations of Kansas traffic laws, the stop quickly morphed into an investigation of drug trafficking. That expansion of the purpose of the stop was justified based on the reasonable suspicion Stopper obtained during the course of the traffic stop. Accordingly, Tsegay's motion is denied.

**A**

Tsegay argues that suppression is required because Stopper unreasonably extended the stop in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015).[3] Doc. 28 at 9. To understand Tsegay's argument, it is helpful to begin with the basic doctrine concerning the lawfulness of traffic stops and the scope of inquiry permitted.

**1**

As noted, a traffic stop constitutes a Fourth Amendment seizure and, as a result, must be reasonable. *United States v. Baker*, 108 F.4th 1241, 1246 (10th Cir. 2024). This means that it must be "justified at its inception and . . . the officer's actions during the stop must be reasonably related in scope to 'the mission of the stop itself.'" *Id.* (quoting *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020)).

In *Rodriguez,* the Supreme Court held that a traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete" it. *Baker*, 108 F.4th at 1246–47 (citing *Rodriguez*, 575 U.S. at 350–51) (citations omitted). And while there is no de minimis exception to

---

[3] After the testimony at the suppression hearing concluded, Tsegay made an oral request to challenge the basis for the stop. The Government objected. Tsegay's attempt to challenge the lawfulness of the stop fails for at least two reasons. One concerns waiver. Tsegay timely filed his opening brief on January 2, 2026, and a reply on January 30, 2026. *See* Docs. 28 & 41. No additional briefs were permitted by the briefing schedule. Tsegay could have raised an argument concerning the lawfulness of the traffic stop either his opening brief or reply. He did not do so. That constitutes a waiver. *See United States v. Vance*, 893 F.3d 763, 770 (10th Cir. 2018) (providing that waiver applies "when a defendant fails to assert a particular argument in a pretrial suppression motion"). The other reason concerns the merits. Even if Tsegay had timely presented the argument, it would have failed. Tsegay argued that Stopper's application of the two-second rule to determine that he had followed the vehicles too closely did not provide an objective basis for the stop. But that argument is foreclosed by application of Kansas and Tenth Circuit precedent to Stopper's testimony. *See State v. Moore*, 154 P.3d 1, 7 (Kan. 2007); *United States v. Hunter*, 663 F.3d 1136, 1143 (10th Cir. 2011); *see also United States v. Figueroa*, No. 24-40031, 2026 WL 746378, at *3 (D. Kan. Mar. 17, 2026) (concluding that the deputy's application of the two-second rule provided an objective basis for the stop); *United States v. Jones*, No. 24-40032, 2025 WL 2996793, at *3 (D. Kan. Oct. 24, 2025) (same).

the rule, *Mayville*, 955 F.3d at 830, the question is only whether "police diligently pursued the [traffic] investigation," *Rodriguez*, 575 U.S. at 354, and not whether they took the quickest route humanly possible to concluding the stop. *Mayville*, 955 F.3d at 827. Thus, courts are not permitted to "second-guess the logistical decisions of officers so long as their actions were reasonable and diligently completed within the confines of a lawful traffic stop[ ] . . . because reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment." *Id.*

The Tenth Circuit has established a three-part test for analyzing the lawfulness of a delay under *Rodriguez*: In particular, an unlawful seizure occurs when an officer diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, does so in a way that "prolongs" (i.e., adds time to) the stop, and the investigative detour is unsupported by any independent reasonable suspicion. *Baker*, 108 F.4th at 1248 (quoting *Frazier*, 30 F.4th at 1173). In other words, "the government prevails if the officers' actions did not divert from the traffic mission, the search was not prolonged, or reasonable suspicion existed." *Id.* An officer may extend the stop if he or she has, at a minimum, reasonable suspicion of criminal wrongdoing. *Baker*, 108 F.4th at 1247 (citing *Mayville*, 955 F.3d at 830). The moment reasonable suspicion becomes necessary is referred to as the *Rodriguez* moment. *Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023) (citing *United States v. Batara-Molina*, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023)).

Although the Government bears the burden of satisfying the reasonable suspicion standard, it is not an onerous one. *Munoz*, 162 F.4th at 1219 (citing *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)). Courts frequently describe the minimal standard of reasonable suspicion by contrasting it with the easy-to-satisfy probable cause: Where probable cause requires a "substantial chance of criminal activity," *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983), reasonable suspicion requires only "some minimal level of objective justification," *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. 411, 417 (1981)). The emphasis is on the "whole picture," *Cortez*, 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors, *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Reasonable suspicion "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act," allowing officers to make "commonsense judgments and

inferences about human behavior." *Kansas v. Glover*, 589 U.S. 376, 380–81 (2020) (emphasis in original) (cleaned up).

This low bar has been explained in recent Supreme Court cases concerning the greater intrusion of stopping a motor vehicle's travel. For example, the Supreme Court held an officer had reasonable suspicion to initiate a traffic stop for driving with a revoked license based on the fact that the registered owner of the vehicle had a revoked license even when it was unclear who was driving the vehicle. *Glover*, 589 U.S. at 381. More recently, the Supreme Court reversed a lower court's conclusion that reasonable suspicion for a traffic stop was lacking where an officer encountered a vehicle, its occupants fled the vehicle, and the driver began backing out of a parking space even though a passenger door had been left open. *District of Columbia v. R.W.*, 2026 WL 1052344, 608 U.S. ___ (2026) (per curiam) (summarily reversing lower court's conclusion that reasonable suspicion was lacking). That makes sense given the purpose of an investigative detention is merely to dispel that suspicion. *See generally Cortez*, 449 U.S. at 421 (recognizing the purpose of the stop is limited by the suspicion).

Under this commonsense approach, "factors consistent with innocent travel may collectively amount to reasonable suspicion." *Leon*, 80 F.4th at 1165. Courts generally defer to the officer—the individual with specialized training and experience—to distinguish between innocent and suspicious behavior unless "an officer relies on a circumstance incorrigibly free of associations with criminal activity." *Id.* (quoting *Frazier*, 30 F.4th at 1174) (internal quotation marks omitted); *see also Cortez*, 449 U.S. at 419 ("[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion."). "As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Munoz*, 162 F.4th at 1219–20 (quoting *Pettit*, 785 F.3d at 1379) (internal quotation marks omitted) (alterations in original). But an officer must point to the specific, articulable facts giving rise to reasonable suspicion; "inchoate suspicions and unparticularized hunches" will not do. *Leon*, 80 F.4th at 1165 (quoting *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010)).

**2**

The thrust of Tsegay's *Rodriguez* and reasonable suspicion argument concerns Stopper's consideration of documents in the cab of the tractor-trailer. Again, for context purposes, it is helpful to understand the general parameters governing an officer's review of ordinary travel documents during a stop for an alleged traffic violation.

Generally speaking, an officer's authority to investigate is constrained by the mission of the traffic stop, which is to ensure that vehicles are operated safely and responsibly. *Rodriguez*, 575 U.S. at 355 (citing *Delaware v. Prouse*, 440 U.S. 648, 658–59 (1979)). As a result, law enforcement officers are permitted to inquire as to the driver's authority to lawfully and safely operate that vehicle. *See United States v. Dawson*, 90 F.4th 1286, 1292 (10th Cir. 2024) (citing *Prouse*, 440 U.S. at 658); *see also Glover*, 589 U.S. at 381 (citing *Prouse*, 440 U.S. at 658, and holding that there was reasonable suspicion to stop a vehicle to confirm whether the driver could lawfully operate the motor vehicle). This also includes an officer's inquiry into travel plans and other constrained questions that would allow the officer to gauge the relative safety of the officer during the encounter. *United States v. Cortez*, 965 F.3d 827, 838–39 (10th Cir. 2020) (permitting officers to make limited inquiries into travel plans and the like and inquiries relative to officer safety).

The scope of the documents pertinent to that inquiry necessarily depends on the vehicle. In *Prouse*, for example, the Supreme Court explained the importance of specific types of documents that should be considered when performing a traffic stop on an ordinary passenger vehicle: A driver's license ensures that an individual is familiar with the rules of the road and is physically qualified to operate a motor vehicle, and the vehicle registration is designed to keep dangerous vehicles off the road. *Prouse*, 440 U.S. at 658; *see also Mich. Dept. of State Police v. Sitz*, 496 U.S. 444, 451, 455 (1990) (recognizing that states have a significant interest in regulating the vehicles on its roadways by preventing drunk driving).

That changes a bit when the passenger vehicle is a rental. In addition to the driver's license, officers are allowed to request and review the rental agreement because it provides similar assurances. *United States v. Dawson*, 90 F.4th 1286, 1292 (10th Cir. 2024) (citing *Rodriguez*, 575 U.S. at 355). This makes sense because inspecting a rental agreement is "akin to inspecting a privately-owned vehicle's registration." *Id.*

11

The universe of relevant documents is different when the stopped vehicle is a commercial tractor-trailer.[4] The First Circuit, for example, has recognized that the *Prouse* rationale as applied to commercial vehicles permits an officer to request a commercial driver's medical certificate and log book because these documents fall in the same category as a driver's license and registration—that is, "they are documents that the trucker is legally required to possess." *United States v. Maldonado*, 356 F.3d 130, 134 (1st Cir. 2004); *United States v. Henderson*, No. 18-312, 2018 WL 4920772, at *5 (D. Neb. June 19, 2019) (applying *Maldonado*). And other courts have applied this rationale to permit officers to review a variety of documents required by the commercial trucking industry during a traffic stop of a commercial tractor-trailer. *See, e.g.*, *United States v. Acosta*, 807 F. Supp. 2d 1154, 1197 (N.D. Ga. 2011) ("[O]fficers may obtain and review the bill of lading and log book and other items related to the operation of the truck.") (collecting cases); *United States v. Pauyo*, 341 F. App'x 955, 956 (5th Cir. 2009) ("Based on the officer's experience with commercial vehicles, the information he obtained from Pauyo's log book and the bills of lading, and Pauyo's demeanor and reluctance to answer routine questions, Trooper Lancaster had a reasonable and objective suspicion that Pauyo was engaged in illegal activity"); *United States v. Cantu*, 227 F. App'x 783, 785 (11th Cir. 2007) (holding that an officer who stopped a commercial vehicle for crossing the white line was justified in examining the log book to investigate whether the driver was impaired); *United States v. Ramirez*, 29 F. App'x 111, 113 (4th Cir. 2002) (affirming suppression where officer reviewed tractor-trailer's bill of lading and log book). And the Tenth Circuit has upheld an officer's request of a commercial driver's log and shipping documents because these documents concern the travel of the commercial vehicle. *United States v. Lopez-Merida*, 466 F. App'x 731, 736 (10th Cir. 2012) (concluding that "during a traffic stop an officer can request the documents concerning the travel—such as driver's license, registration, rental contract, or, as here, the driver's

---

[4] The distinction between the rules governing commercial truck drivers and those governing operating passenger vehicles is hardly novel. *Compare United States v. Vasquez-Castillo*, 258 F.3d 1207, 1210 (10th Cir. 2001) (recognizing that "commercial trucking is an industry closely regulated by both federal and state governments"); *with United States v. Herrera*, 444 F.3d 1238, 1243 (10th Cir. 2006) (reversing denial of motion to suppress because the officer incorrectly believed that the vehicle was a commercial vehicle subject to warrantless regulatory search of commercial property and had no reasonable suspicion).

log and shipping documents," which included a bill of lading in this case).[5]

**B**

With these concepts in mind, it is now possible to identify and address Tsegay's *Rodriguez* arguments. All told, he argues that Stopper impermissibly prolonged the stop four times. The first is when Stopper initially approached the tractor-trailer and reviewed Tsegay's bill of lading. Doc. 28 at 2. The second occurs in the patrol vehicle when Stopper first reviewed Tsegay's log book and bill of lading and asked what he was hauling. *See id.* at 3–4. The third is later on in the patrol vehicle when Stopper resumed review of his commercial documentation and asked Tsegay about his cargo. *See id.* at 5. And the fourth is when Stopper once again questioned Tsegay about his route, had Blake deploy his drug dog Chera, and Chera indicated to the presence of drugs. *See id.* at 6. But none of these actions unlawfully extended the stop.

**1**

The first alleged *Rodriguez* moment—Stopper's brief review of Tsegay's bill of lading while checking his driver's license—fails. *Contra* Doc. 28 at 9–10. Even Tsegay concedes that he must travel with a bill of lading—a document containing information about the vehicle's cargo and travel route—because of regulatory requirements for operating a commercial vehicle. *See* Doc. 52 at 3. And, generally speaking, the Tenth Circuit has permitted an officer to check documents a driver is legally required to possess during a traffic stop. *See United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004) ("In the context of routine traffic stops, a law enforcement officer may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate."). The Tenth Circuit has even applied this general rule in the commercial truck context, holding that an officer may request the driver's log and shipping documents like the bill of lading during the traffic stop. *See Lopez-Merida*, 466 F. App'x at 736 (citing *Rosborough*, 366 F.3d at 1148).

---

[5] *Lopez-Merida* is unpublished and is therefore not precedential, but the factual similarity between it and the instant case makes its reasoning particularly persuasive. *See, e.g.*, *United States v. Hebert*, 159 F.4th 777, 780 n.3 (10th Cir. 2025) (citing an unpublished case for its persuasive value under Fed. R. App. P. 32.1 and 10th Cir. R. 32.1).

And, of course, that view is consistent with that of other courts that have considered the issue. *See Acosta*, 807 F. Supp. at 1197; *Cantu*, 227 F. App'x at 785. As a result, Stopper's review of the bill of lading is part and parcel of a traffic stop, akin to registration of a passenger vehicle or the rental agreement on a rental vehicle. *Maldonado*, 356 F.3d at 134; *Lopez-Merida*, 466 F. App'x at 736.

Tsegay's counterarguments are unpersuasive. For instance, he argues—without authority—that an officer may only ask for things a driver is required to produce in order to operate the vehicle. *See* Doc. 52 at 3.[6] Not so. Officers may lawfully request and inspect those documents needed to confirm the safe and lawful operation of the motor vehicle. *See Prouse*, 440 U.S. at 658 (explaining that one aspect of promoting highway safety is ensuring that "vehicles are fit for safe operation"). And in the commercial truck context, that frequently includes a bill of lading, log book, commercial driver's license, or similar items. *See supra* at II.A.2.

In addition, Tsegay claims *Rodriguez* by implication displaced any rule that would permit an officer to review a commercial driver's commercial documents pursuant to a traffic stop. *See* Doc. 52 at 6–10. That argument fails for many reasons. One is that it lacks legal support because it ignores the unbroken string of cases applying the *Prouse* concept in all contexts both before and after *Rodriguez*. *See supra* at II.A.2 (citing a string of cases before and after *Rodriguez*). Another is that it contravenes a core precept of *Rodriguez*, where the Supreme Court reaffirmed *Prouse*'s recognition that officers may conduct ordinary traffic stops to advance the mission of ensuring highway safety while recognizing that this mission could not expand absent justification. *See Rodriguez*, 575 U.S. at 355; *see also Dawson*, 90 F.4th at 1291–92 (recognizing the traffic mission announced in *Prouse* within the *Rodriguez* framework that prohibits unlawful expansions absent independent reasonable suspicion).

Finally, Tsegay argues that Stopper did not have the requisite training and experience to examine his commercial documents. *See* Doc. 52

---

[6] At the suppression hearing, Tsegay was permitted to research and submit supplemental briefing on the issue of whether Stopper could review the bill of lading pursuant to the traffic stop. *See* Doc. 50. Tsegay filed a supplemental brief and a response to the Government's brief answering the same. *See* Docs. 52 & 53.

at 10; *see also* Doc. 53 at 11. In essence, he notes that Stopper is not permitted to review the bill of lading because commercial trucking is a heavily regulated industry with highly specialized rules, that Kansas identifies a group of officers authorized to engage in the regulation of those vehicles, and that Stopper is not within that class of officers. Doc. 52 at 10; *see also* Doc. 53 at 3–11. That argument is a red herring: Stopper was not undertaking a regulatory inspection; he was conducting a traffic stop of a commercial tractor-trailer to confirm that the driver could lawfully and safely operate the vehicle on the roadway. That inquiry neither required nor relied upon any regulatory training or experience. It was simply a traffic stop of a commercial tractor-trailer for a violation of a traffic law applicable to every vehicle on a Kansas roadway, something Stopper's testimony confirms he has experience and training to do.

**2**

Tsegay's second *Rodriguez* argument—that Stopper prolonged the stop when he entered the patrol vehicle and started looking at Tsegay's commercial papers—fails. *Contra* Doc. 28 at 10. This is because, based on the totality of the circumstances, Stopper reasonably suspected that the tractor-trailer was engaged in criminal activity. As a result, *Rodriguez* no longer applies and Stopper was warranted in extending the lawful stop to dispel that suspicion. *See United States v. Samilton*, 56 F.4th 820, 828–29 (10th Cir. 2022).

The totality of the circumstances confirms that Stopper suspected that Tsegay's tractor-trailer was engaged in trafficking. In particular, Tsegay lied about his travel plans. Tsegay claimed that he and Haliab were coming from Sacramento (in Northern California) but Stopper knew, based on automated license plate reader data,[7] that Tsegay's tractor-trailer had been traveling northbound on Interstate 15 from Southern California. Implausible or false statements about travel plans are commonly accepted as a basis for reasonable suspicion. *See, e.g.*, *United*

---

[7] Tsegay makes no challenge to Stopper's reliance on automated license plate reader data. *See United States v. Oakes*, No. 25-40006, 2026 WL 1020818, at *8 (D. Kan. Apr. 15, 2026) (rejecting defendant's invocation of *Carpenter v. United States*, 585 U.S. 296 (2018), and finding that the defendant had no subjective expectation of privacy in a license plate).

*States v. Munoz*, 162 F.4th 1210, 1221 (10th Cir. 2025) (finding that evasiveness about travel plans contributed to reasonable suspicion).

Stopper also testified that Tsegay and Haliab were extremely nervous. He testified that Tsegay had a wide-eyed appearance, that his breathing was rapid and deep, that he could see Tsegay's heartbeat, and that Haliab seemed to be displaying similar signs of stress. This too served as a basis for reasonable suspicion. *See Pettit*, 785 F.3d 1374, 1381 (10th Cir. 2015) (finding that "abnormal nervousness" contributed to reasonable suspicion). Stopper noted that, based on his experience, Tsegay and Haliab's nervousness was uncharacteristic for members of the commercial motor vehicle motoring public who frequently experience stops, for example, at weigh stations and for inspections. That, too, is entitled deference. *See Simpson*, 609 F.3d at 1146 (giving weight to the officer's ability to distinguish between innocent and suspicious conduct).

These factors collectively established reasonable suspicion of drug trafficking that warranted further investigation of the lawful stop. As a result, Stopper was justified in expanding the mission of the traffic stop to confirm or dispel his suspicions. *See Munoz*, 162 F.4th at 1222 (concluding that the troopers were justified in briefly extending the stop to ask Mr. Munoz additional questions and seek his consent to search the vehicle based on similar factors in this case, namely the defendant's nervousness and purported travel plans).

Tsegay opposes this conclusion but his arguments lack merit. First, he challenges Stopper's credibility by arguing that the video evidence does not show his shirt bouncing off of his stomach. But Stopper testified that his body camera could not capture what he observed in person. He also testified that his flashlight obscured Haliab from view. Although the video footage is not clear enough to identify and evaluate all of the minute details Stopper offered,[8] Stopper credibly testified that Tsegay seemed nervous based on his wide-eyed appearance, deep and rapid breathing, and Stopper's perception of Tsegay's visible heartbeat. Stopper's testimony, despite its unnecessary rhetoric, was sufficiently credible. *See United States v. Kitchell*, 653 F.3d 1206, 1220–21 (10th Cir.

---

[8] To the extent Stopper claims to have seen Tsegay's shirt literally jump or bounce off of his chest, that contention is rejected as inconsistent with common sense contrary to the video evidence. Rather, the phrase is accepted as a hyperbolic way of describing Tsegay's extreme nervousness.

2011) (finding reasonable suspicion even though the videotape lends some credence to the defendant's argument).

He also attempts to undermine reasonable suspicion by claiming that nervousness, standing alone, cannot constitute reasonable suspicion. Doc. 41 at 5. Fair enough. *Cortez*, 965 F.3d at 835 (providing that mere nervousness does not alone generate reasonable suspicion because it is common for most people to be nervous when confronted by law enforcement). But so what: Nervousness did not stand alone; it was part of a broader collection of circumstances that, in totality, justified Stopper's reasonable suspicion. And isolating it, as Tsegay seeks to do, would run headlong into what the Supreme Court recently and firmly rejected—courts attempting to isolate, discount, and ignore factors from the total picture confronting the officer. *See R.W.*, 2026 WL 1052344, at *3 (criticizing the lower court for "reviewing facts piecemeal and without context" instead of considering that all of the facts (including those disregarded by the lower court) provided the whole picture establishing reasonable suspicion).

Tsegay also argues that some of the factors the Government relies on in its brief to support reasonable suspicion at the second *Rodriguez* moment surfaced only after the moment had begun. Doc. 41 at 10. It is true that, throughout the course of the detention, Stopper learned and uncovered additional details that pointed to the likelihood that criminal conduct was afoot. For example, these facts include Tsegay being unfamiliar with the contents of the trailer, the fidelity of the seal, whether it matched the bill of lading, and the equivocal statements about where they had been, what stops they made, and the like. But all of those facts occurred after Stopper already possessed reasonable suspicion. In other words, these facts strengthened the initial suspicion that Stopper already had. *See Pettit*, 785 F.3d 1374, 1383 (10th Cir. 2015) (affirming the district court's finding of reasonable suspicion based on similar factors that were known to the officer when he extended detention following the stop); *see also United States v. Coleman*, 483 F. App'x 419, 421 (10th Cir. 2012) (noting that defendant's argument concerning the officer's suspicions that the seal number on the trailer did not match the bill of lading was better suited for a Fourth Amendment reasonable suspicion analysis).

Finally, Tsegay argued at the hearing that there was a language barrier between him and Stopper. Tsegay's counsel explained that Tsegay is a citizen of Eritrea and speaks Tigrinya, which is one of several languages spoken in Eritrea. But the video evidence and testimony show

that Tsegay was able to communicate with Stopper in conversational English throughout the stop. And, even if there were language difficulties, Tsegay has not shown that they might do anything more than offer a plausible innocent explanation to some of the questions Stopper posed. Of course, an officer need not subjugate his or her training and experience to the post-hoc, innocent explanation of an encounter. *See Munoz*, 162 F.4th at 1221 (finding that Munoz's answers with respect to his travel plans "support[ed] a finding of reasonable suspicion even if there might be an innocent alternative explanation for Mr. Munoz's unusual uncertainty" about them); *see also United States v. Manjarrez*, 348 F.3d 881, 886 (10th Cir. 2003) (concluding that a working knowledge of the English language was sufficient for an encounter to be consensual).

\* \* \*

The existence of reasonable suspicion precludes Tsegay's second, third, and fourth *Rodriguez* arguments. Stopper developed reasonable suspicion when Tsegay represented that he was traveling from Sacramento—which contradicted the license plate reader data—and displayed unusual nervousness for someone in the commercial trucking industry. That warranted a limited investigation to confirm or dispel Stopper's suspicion. *See generally Cortez*, 449 U.S. at 421 (recognizing the purpose of the stop is limited by the suspicion). And each of Stopper's attempts to dispel the suspicion only led to greater suspicion—and commensurate need to undertake additional investigative questioning—until the K-9 exterior sniff and subsequent search confirmed it. That precludes an application of *Rodriguez*. *Frazier*, 30 F.4th at 1173.

### III

For the foregoing reasons, Tsegay's Motion to Suppress, Doc. 28, is DENIED.

It is so ordered.

Date: May 4, 2026                 <u>s/ Toby Crouse</u>
                                   Toby Crouse
                                   United States District Judge

18